UNITED STATES DISTRICT COURT

DISTRICT OF MAINE

| | |
|---|---|
| UNITED STATES OF AMERICA, )<br>)<br>v.                                                              )<br>)<br>MARIE S. PAUL,                                    )<br>)<br>Defendant                                         ) | Crim. No. 05-69-B-W |

**RECOMMENDED DECISION ON MOTION TO SUPPRESS**

Marie Paul is charged with the importation of oxycontin, a controlled substance, in violation of 21 U.S.C. § 952(a). She has filed a motion to suppress (Docket No. 11) both statements and evidence that was seized from her during a secondary border search and a subsequent criminal investigation interview at the Calais Port of Entry border station office on March 31 – April 1, 2005. An evidentiary hearing was held on December 15, 2005, but, because a witness had been subpoenaed by the defendant and did not appear at the hearing, the matter was recessed until January 5, 2006, to give Paul an opportunity to attempt to secure the witness's compliance with the subpoena. The witness again did not appear at the continued hearing. Paul rested her case subject to this court's decision about what further action it might take in regard to obtaining the presence of the witness. She had no further evidence to present on the motion to suppress. Additionally the Government has filed affidavits from three officers detailing their involvement in the investigation. Based upon the evidence presented and affidavits filed I now recommend that the court adopt the following findings of fact and **DENY** the motion.

**Proposed Findings of Fact**

Kevin McIntyre is a supervisor with the Customs & Border Protection, Department of Homeland Security (CBP) assigned to the Calais, Maine Port of Entry. He has been an employee of CBP, including his tenure with its predecessor agency, the U.S. Customs Service, for eight and one-half years. On March 31, 2005, he was employed as an acting supervisor and was supervising the Port of Entry (POE) in Calais, Maine. Based upon his prior experience McIntyre knew that the Calais POE was a border crossing at which individuals involved in the drug trade attempted to smuggle illegal narcotics into the United States from Canada and that the smugglers were known for secreting illegal narcotics within their body cavities and attempting to surreptitiously bring them into the country.

On March 31, 2005, at 10:50 p.m., McIntyre received a call from CBP Officer Georgina Brown who was working the Milltown, Maine POE. Officer Brown reported she had received a tip from an anonymous caller stating that Amy Wilson and Marie Paul would be smuggling narcotics into the United States that evening. The tipster also reported that the two women would attempt to smuggle the drugs into the country internally. In addition, the tipster reported that the two would be traveling in a tan or gold Saturn automobile with Maine license plates.

At approximately 11:15 p.m., Marie Paul arrived at the Calais POE in a gold four-door Saturn with Maine license plates and she was directed to secondary inspection by CBP officer William Brown. The Government introduced no evidence that Brown asked anything but the most routine questions of Paul or that Brown developed any individualized suspicion regarding Paul and I conclude that the basis for Brown's

decision to refer Paul to secondary inspection was at least in part the information in the anonymous tip. Amy Wilson arrived separately at the Milltown POE, approximately two miles away. Although Wilson was also subject to a secondary search, including an X-ray performed at a local hospital, no drugs were found in connection with her entry into the United States.

Although the Government offered affidavits and testimony from Donald Ardell, Bruce Gauthier, and Kevin McIntyre about the events that occurred during Paul's secondary inspection, I found the testimony offered by CBP officer Maxwell Young, subpoenaed by the defendant, to be the most accurate and complete description of what occurred between 11:15 p.m. March 31 and 12:07 a.m. April 1, 2005. To the extent the other officers offered conflicting details regarding the timing or the sequence of events as to that time frame, I base these proposed findings of fact on the testimony of Young; Young was the officer who actually conducted the examination, noted the time in writing during the events, and prepared a contemporaneous report of the events. He was also an extremely credible witness.

When Marie Paul entered the POE office at 11:15 p.m. Young observed that she appeared extremely nervous, avoiding eye contact and "acting guilty." Based upon the anonymous tip he suspected that she might have drugs in her possession and her demeanor did nothing to assuage his suspicions. Initially Young did not reveal to Paul that he had intelligence information concerning her potential drug trafficking activities. At first Young asked Paul the routine questions regarding her visit to Canada. He asked her to be seated in the lobby to complete a written customs declaration (Docket No. 27, Ex. 4.) The form was completed by approximately 11:20 p.m.

Young then went outside to Paul's vehicle, leaving her seated in the lobby. Young spent approximately twenty minutes conducting a thorough search of the vehicle. He discovered several small plastic baggies, rolling papers, and a pair of scissors containing a residue that tested positive for marijuana. Young returned to the lobby and asked Paul to empty her pockets on the counter. At that point Young went into a private office to speak with McIntyre, his supervisor, to obtain McIntyre's approval to conduct a search of Paul's person based upon the items he had discovered in her car. At 11:45 p.m. Young returned to the lobby to conduct the final portion of his interview with Paul.

At first Paul denied that she had any drugs on her person. Young questioned the veracity of her statements regarding her trip to Canada, revealing that the "he knew what was going on." He asked Paul if she would consent to have an x-ray performed at a local hospital. Young further advised her that she would be searched and that she could be in serious trouble. Paul expressed concern regarding her children and became upset. She admitted to Young that she was carrying drugs in her vaginal cavity. After Paul made that admission, Young advised Paul not to say anything more regarding the drugs. He left the room and told McIntyre of Paul's admission. This portion of secondary inspection lasted about five minutes.

After speaking with McIntyre, Young called two female officers to accompany Paul to the search room to retrieve the drugs. Paul left the lobby with the female officers to go downstairs at 11:56 p.m. Their personal search of Paul concluded at 12:07 a.m. when the drugs were seized. At that time the ICE agents, Gauthier and Sanchez, were contacted in Houlton, Maine, and they proceeded to Calais, arriving at approximately 2:00 a.m. to continue the investigation. McIntyre, Young, and Gauthier did not observe

4

Paul to be exhibiting the symptoms of someone who was presently under the influence of drugs.

Gauthier and Sanchez interviewed Paul. They fully advised Paul of her <u>Miranda</u> rights and she agreed to speak with them about her activities that evening. There were no threats made against Paul nor did the officers coerce her in any way to cause her to speak with them. Eventually Paul was released from custody and allowed to return to her home that night. Ardell followed up on the investigation by contacting Paul sometime in the middle of April 2005. He did not specifically advise Paul of any <u>Miranda v. Arizona</u>, 384 U.S. 436 (1966) rights when he spoke with her at her parents' house. He personally questioned Paul on two occasions, the second time being approximately the first of May. She indicated she understood about her rights that had been previously explained by Gauthier and Sanchez and she was co-operative with the agents regarding her drug smuggling role.

## Discussion

As anyone who has ever entered the United States from abroad through a proper port of entry knows, border crossings by their very nature are likely to involve some type of questioning. Determining when this questioning becomes a custodial interrogation for purposes of <u>Miranda</u> involves a balance of interests. Obviously a person arriving at a port of entry is not free to leave until released by customs officials, but the degree of restraint inherently associated with routine customs' questioning is not custodial. <u>United States v. Tajeddini</u>, 996 F.2d 1278, 1288 (1st Cir. 1993). The First Circuit has made clear that even secondary inspections at a border crossing do not, per se, constitute custodial interrogation. <u>United States v. Pratt</u>, 645 F.2d 89, 90-91 (1st Cir. 1981). Instead, the

5

Circuit encourages a holistic approach to border crossing interrogations, id., and the court must take into account the strong governmental interest in controlling our borders, see United States v. Moya, 74 F.3d 1117, 1119-20 (11th Cir. 1996). It has been suggested that the court might consider the following: (1) the nature of the surroundings; (2) the extent of police control; (3) the degree of physical restraint placed upon the defendant; and (4) the duration and character of the questioning. United States v. Fernandez-Ventura, 132 F.3d 844, 846 (1st Cir. 1998); see also Pratt, 645 F.2d at 90-91.

> As the First Circuit Court of Appeals has succinctly explained:
>
> > It is well established that Miranda warnings must be communicated to a suspect before she is subjected to "custodial interrogation." United States v. Ventura, 85 F.3d 708, 710 (1st Cir. 1996). A "custodial situation necessitating Miranda warnings arises . . . where 'there is a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest.'" United States v. Masse, 816 F.2d 805, 809 (1st Cir.1987) (quoting California v. Beheler, 463 U.S. 1121, 1125 (1983)). The term "interrogation" encompasses not only express questioning but also "any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." Rhode Island v. Innis, 446 U.S. 291, 301 (1980) (internal footnotes omitted).
>
> United States v. Li, 206 F.3d 78, 83 (1st Cir. 2000).

I apply the Fernandez-Ventura factors to the events of March 31, 2005. The surroundings -- the lobby of the Calais Port of Entry -- were not especially intimidating. Paul was never taken into a private interview room until the personal search, after her admission. She was questioned in the public lobby, not in a small interview room. While clearly Paul was not free to leave the lobby, the customs officer was behind a counter for most of the time. There was no physical restraint, such as handcuffs, placed upon Paul. While the length of the interview is never determinative in itself, Young only spent about

6

ten minutes actually speaking with Paul. His initial five-minute encounter with Paul when he had her complete the customs declaration can only be described as routine. His second round of questioning, lasting for approximately another five minutes after he had searched the vehicle and obtained authorization from his supervisor to proceed with a personal search, might be described as more intense and confrontational. However, Young did nothing unduly coercive to obtain Paul's consent to retrieve the pills. Asking her if she would agree to an x-ray was not unreasonable given the circumstances. He allowed Paul to tell her story about where she had been and what she had been doing in her own words and simply responded to her that he did not believe what she had told him. It is not unreasonable that a person confronted with marijuana residue found in her car at a border crossing, knowing she had controlled substances on her person, would admit to the fact and voluntarily consent to retrieve those substances rather than be subjected to additional and more intrusive border inspections prior to entering the country.

## Conclusion

Based upon the foregoing I recommend the court **DENY** the motion to suppress.

## NOTICE

A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which de novo review by the district court is sought, together with a supporting memorandum, within ten (10) days of being served with a copy thereof. A responsive memorandum shall be filed within ten (10) days after the filing of the objection. Failure to file a timely objection shall constitute a waiver of the right to de novo review by the district court and to appeal the district court's order.

January 13, 2006

/s/ Margaret J. Kravchuk
United States Magistrate Judge